## Commonwealth vs. Mark Narcisse.

No. 07-P-1445.

Suffolk. October 2, 2008. - December 24, 2008.

Present: Cypher, Grasso, & Kantrowitz, JJ.

Further appellate review granted, 453 Mass. 1104 (2009).

*Firearms. Constitutional Law,* Investigatory stop. *Search and Seizure,* Reasonable suspicion, Protective frisk.

Discussion of the standard of review applicable to a decision on a motion to suppress evidence. [408]

Discussion contrasting the requirements for a classic investigatory stop with the justification for a protective frisk. [408]

A Boston Municipal Court judge properly denied the criminal defendant's motion to suppress evidence of a loaded firearm that a police officer seized from the defendant's jacket pocket, where the officer was justified in conducting a protective frisk, in that various environmental factors (including that the encounter occurred at night in a high crime area where a nearby shooting happened only hours before) and the defendant's responses to police questioning, considered together, gave rise to the officer's reasonable fear that the defendant might have a weapon. [408-410]

COMPLAINTS received and sworn to in the Dorchester Division of the Boston Municipal Court Department on January 31, 2005.

A pretrial motion to suppress evidence was heard by *James W. Coffey,* J.; after transfer to the Central Division of the Boston Municipal Court Department, the cases were heard by *Annette Forde,* J.

*Christopher L. Maclachlan* for the defendant.

*Noah Spaulding (Janis Dilureto Noble,* Assistant District Attorney, with him) for the Commonwealth.

KANTROWITZ, J. After a jury-waived trial, the defendant, Mark Narcisse, was convicted of carrying a firearm without a license, G. L. c. 269, § 10(*a*); and unlawful possession of ammunition, G. L. c. 269, § 10(*h*). On appeal, the defendant argues that the motion judge (who was not the trial judge) erroneously denied

the defendant's motion to suppress because (1) the Commonwealth failed to prove that reasonable suspicion supported the investigatory stop; and (2) there was no objective safety concern to warrant the protective frisk. While acknowledging, as did the motion judge, that the case is close, we, nonetheless, affirm.

*Facts.* We take the facts from the findings of the motion judge and the testimony of Officer Stephen Romano, who was the only witness to testify at the hearing on the motion to suppress, and who the motion judge found credible. See *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 43 (2002). On January 30, 2005, at approximately 10:00 P.M., Boston police Officer Stephen Romano and his partner, Officer David Yee, were on patrol in an unmarked cruiser with Sergeant Steven McLaughlin in the area of Charles Street in the Dorchester section of Boston. Officer Romano, a nine-year veteran of the Boston police force, testified that they were directed to patrol the area because one of the "impact players" in the area had been murdered the previous night in Randolph, and the police department was concerned that there would be retaliation in the area. The Charles Street and Geneva Avenue area is considered by the police department to be a "hot spot" because of the frequent reports of gunfire. Indeed, earlier that evening, at approximately 7:00 P.M., while Officer Romano was on duty, shots had been fired into an apartment on East Street, less than one mile from the corner of Charles Street and Geneva Avenue. The police had no information on the perpetrators of either the murder in Randolph or the gunfire on East Street.

At about 10:00 P.M., Officer Romano observed two black males, one of whom was later identified as the defendant, standing on the corner of Charles Street and Geneva Avenue. As the officers drove down Charles Street toward the defendant and his companion, they began walking down Geneva Avenue. The officers, still in their cruiser, followed the men down Geneva Avenue, pulled up alongside the men, and asked them their names and whether they lived in the area, as both men were unfamiliar to the officers. The defendant responded that he was from Randolph (the same town where the local impact player had been murdered the previous night). While still in his cruiser, Officer Romano then asked where they were coming from, and the defendant responded that they were coming from "the store," an answer

that Officer Romano found suspicious because he knew of no stores on Charles Street. Officer Romano then asked the defendant and his companion if the officers could talk with them and if they could step over to the sidewalk, which they did.

At this point, Officer Romano told the defendant and his companion about the earlier shooting and informed them that he was going to conduct a patfrisk. Officer Romano then conducted a protective frisk of the defendant and testified that he did so "[f]or my safety." Officer Romano felt what he believed to be a firearm in the defendant's left front jacket pocket and recovered a loaded .22 caliber firearm. The officers then ascertained that the defendant did not possess the requisite license or permit for carrying such a weapon and placed him under arrest.

*Discussion.* "When reviewing a motion to suppress, we adopt the factual findings of the motion judge absent clear error." *Commonwealth* v. *DePeiza,* 449 Mass. 367, 369 (2007). "We 'independently determine the correctness of the judge's application of constitutional principles to the facts as found.' " *Ibid.,* quoting from *Commonwealth* v. *Catanzaro,* 441 Mass. 46, 50 (2004).

1. *Investigatory stop.* As in *Commonwealth* v. *Fraser,* 410 Mass. 541, 544 n.4 (1991), what occurred here was not the classic investigatory stop, requiring "reasonable suspicion that the person seized has committed, is committing, or is about to commit a crime." *Commonwealth* v. *DePeiza,* 449 Mass. at 371. In such an instance, the suspicion "must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom.' " *Ibid.,* quoting from *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004).

Rather, what occurred here was a protective frisk, "justified where an officer reasonably believes the defendant is armed and dangerous." *Commonwealth* v. *Fisher,* 54 Mass. App. Ct. at 44. The police are always free to approach a defendant and ask preliminary questions, as the officer did here. See *Commonwealth* v. *Murdough,* 428 Mass. 760, 763 (1999) ("it is quite clear that officers may make inquiry of anyone they wish").

2. *Protective frisk.* In *Commonwealth* v. *Fisher, supra* at 47, this court concluded there was no error in the denial of the defendant's suppression motion, challenged on appeal from his con-

viction of unlawful possession of a firearm. As in the instant case, the officers had approached the defendant at night in a high crime area. *Id.* at 43. When the officers drove towards the defendant in their marked police cruiser, the defendant looked at the cruiser and then abruptly "did a U-turn" and walked away at a fast pace. When the officers pulled the cruiser up to the sidewalk, the defendant made a quick gesture to his waist area. *Ibid.* This court held that the ensuing protective frisk of the defendant was justified because, taken together, the late hour in the high crime area, the evasive reaction of the defendant, and the defendant's quick motion to his waist provided the officer with a reasonable basis for a safety concern. *Id.* at 44-46. Even though the individual elements of the situation would not, by themselves, have been enough to warrant police intervention, the combination of factors supported the requisite reasonable belief that the defendant could be armed and dangerous. *Id.* at 44.

Another example of a protective frisk may be found in *Commonwealth* v. *Fraser*, 410 Mass. 541 (1991). There, a police officer responded to a radio call about a man with a gun in a high crime neighborhood. *Id.* at 542. When the officer arrived at the scene, he saw a group of young men standing on the sidewalk, the defendant among them. The officer saw the defendant bend down behind a truck "as though to pick something up or put something down." When the officer approached the defendant, the defendant stood up with his hands in his coat pockets. *Ibid.* After asking the defendant to remove his hands from his pockets, the officer conducted a protective frisk and found a loaded handgun. *Id.* at 542-543. The court held that the combination of factors — the radio call, the nature of the neighborhood as a high crime area, the defendant's bending down behind a truck as though to pick something up, and the fact that at all critical times the defendant kept his hands in his pockets — justified the pat-down. *Id.* at 545. The combination of these factors, while each innocent by itself, when taken together, provided the requisite reasonable belief that the defendant could be armed and dangerous. *Ibid.*

In the instant case, a similar combination of factors provided the officer a reasonable safety concern and justified the protec-

tive frisk. As in *Fisher* and *Fraser*, the encounter occurred at night in a clearly and undeniably high crime area where "shots [were] fired . . . on a nightly basis," including a nearby shooting that had occurred only hours before. Moreover, the officers had been directed to patrol the area due to concerns of potential retaliation for a homicide the previous night in Randolph. The fact that the defendant provided a Randolph address at the scene was concerning and rightly considered by the officers. The defendant's apparently false statement that he was coming from "the store," when there were no stores on Charles Street, further raised the officer's suspicions. Lastly, the police officer, who was a veteran of that area, having patrolled it for nine years, did not recognize either of the two persons. Individually, each element may not have been enough to warrant police intervention, but when considered together, the general environmental factors and the defendant's responses to police questioning gave rise to the officer's reasonable fear that the defendant might have a weapon. Contrast *Commonwealth* v. *Knowles*, 451 Mass. 91, 99 (2008).

We recognize that, unlike the cases cited, there was here no furtive gesture giving rise to a safety concern. However, the absence of that factor does not eliminate one's objective level of concern. See generally *Commonwealth* v. *Feyenord*, 445 Mass. 72, 76 (2005) (concluding that police order to exit vehicle was proper, and observing that, "[a]lthough the exit order was not predicated on suspicious movements or the visible presence of a weapon or possible contraband, police officers need not gamble with their personal safety, and the course of events . . . sufficiently gave rise to legitimate safety concerns" [quotations and citations omitted]). A police officer often has "no more than a few seconds in which to assess the extent . . . of the danger, and to ascertain the most effective and least intrusive means of protecting himself." *Commonwealth* v. *Dedominicis*, 42 Mass. App. Ct. 76, 79 (1997), quoting from *Commonwealth* v. *Johnson*, 413 Mass. 598, 601 (1992). The officer, here, was justified in conducting a protective frisk.

*Judgments affirmed.*