### COMMONWEALTH *VS.* MARK NARCISSE.

Suffolk. November 5, 2009. - May 27, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Firearms. Practice, Criminal,* Motion to suppress. *Constitutional Law,* Stop and frisk, Reasonable suspicion. *Search and Seizure,* Protective frisk, Reasonable suspicion.

This court concluded that police officers may not escalate a consensual encounter with an individual into a protective frisk absent a reasonable suspicion that the individual has committed, was committing, or was about to commit a criminal offense, and that the individual is armed and dangerous; thus, a judge of the Boston Municipal Court Department erred in denying a criminal defendant's motion to suppress evidence obtained by police during a patfrisk of the defendant following a consensual field interrogation observation, where, although the circumstances provided the police officers with ample reason to approach the defendant to ask him about his business for being in the area, the defendant clearly did not manifest behavior that indicated that he was engaged in criminal activity or that he was armed and dangerous. [5-13]

COMPLAINT received and sworn to in the Dorchester Division of the Boston Municipal Court Department on January 31, 2005.

A pretrial motion to suppress evidence was heard by *James W. Coffey*, J.; after transfer to the Central Division of the Boston Municipal Court Department, the case was heard by *Annette Forde*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Christopher L. Maclachlan* for the defendant.

*Janis DiLoreto Noble*, Assistant District Attorney, for the Commonwealth.

*John Reinstein, Charles Ogletree, Robert J. Smith, Harry T. Daniels, & Kevin S. Prussia*, for American Civil Liberties Union & another, amici curiae, submitted a brief.

CORDY, J. The defendant, Mark Narcisse, was charged with carrying a firearm without a license, G. L. c. 269, § 10 (*a*), and possession of ammunition without a firearms identification card, G. L. c. 269, § 10 (*h*), after he was pat frisked by police officers during a consensual encounter referred to in police parlance as a "field interrogation observation."[1] The defendant moved to suppress the firearm, the ammunition, and the statements he made to the police, claiming that the patfrisk constituted an unlawful stop and seizure by the police under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. The motion was denied after a hearing, and following a jury-waived trial, the defendant was convicted of both charges. The Appeals Court affirmed his convictions, *Commonwealth* v. *Narcisse*, 73 Mass. App. Ct. 406, 407 (2008), and we granted his application for further appellate review. We now reverse.

1. *Background.* We summarize the motion judge's findings of fact, with supplementation from uncontested testimony, noting that all his findings, save one,[2] are supported by the evidence

---

[1]"A 'field interrogation observation' has been described as an interaction in which a police officer identifies an individual and finds out that person's business for being in a particular area." *Commonwealth* v. *Lyles*, 453 Mass. 811, 813 n.6 (2009), citing *Commonwealth* v. *Murphy*, 63 Mass. App. Ct. 11, 13 n.4 (2005).

[2]See note 3, *infra*.

he found credible. Consequently, we accept them. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001).

a. *The stop and frisk.* On January 30, 2005, Officer Stephen Romano, Officer David Yee, and Sergeant Stephen McLaughlin were directed to patrol the Geneva Avenue area of the Dorchester section of Boston. The area, which Officer Romano had patrolled for nine years, was considered a "hot spot," with nightly gunfire and drug activity occurring. Indeed, at around 7 P.M. that evening, there had been shots fired into an apartment on East Street, about one-half mile from Geneva Avenue. The officers were also aware that one of the "impact players" who lived in the area had been killed in Randolph the previous night, and that the Boston police department was concerned about the possibility of retaliatory attacks in the Geneva Avenue area. However, the police had no information about the identity of the individuals involved in either the shooting on East Street or the murder in Randolph.

At 10 P.M., the officers drove down Charles Street in an unmarked cruiser. They observed two black men walking on Charles Street turn left onto Geneva Avenue. The officers pulled alongside and, not recognizing the men, decided to conduct a field interrogation observation in order to discover what the men were doing. While still in their cruiser, the officers asked the men who they were and whether they lived in the area. The men provided their names to the officers, and the defendant told the officers he was from Randolph. He also told the officers that he was coming from a store. Officer Romano knew that there were stores nearby, although not on Charles Street, but for some reason he found the defendant's response implausible.[3]

Officer Romano asked the men if they could step over to the sidewalk for further discussion, and the men complied. The officers got out of their vehicle and informed the men that there had been "activity in the area." After some conversation with the two men (the content of which was not specified), Officer Romano informed them that the officers were going to pat frisk them. In doing so, the officers recovered a loaded .22 caliber firearm from the front pocket of the defendant's jacket. Sergeant

---

[3]Officer Romano's explanation was not transcribed because it was inaudible. However, finding the testimony credible, the motion judge incorporated the conclusion that the defendant's answer was "implausible" into his findings.

McLaughlin ascertained that the defendant did not have a license authorizing him to carry the firearm, and arrested him. After the defendant received the Miranda warnings, he stated that he had found the weapon under a nearby bridge.

b. *Motion to suppress.* The defendant moved to suppress the firearm, ammunition, and his subsequent statements. After finding that the defendant was "seized" when the officers announced their intention to pat frisk him, and noting that the circumstances presented a "very close case," the motion judge set out the factors weighing for and against suppression. In the defendant's favor, the judge acknowledged that (1) the defendant made no furtive or sudden movements during the encounter; (2) the police had no reason to suspect that the defendant was linked to the earlier shooting on East Street; (3) the police had no reason to believe that either the defendant or his companion was involved in criminal activity; and (4) the defendant did not flee the police but, rather, cooperated fully. Cutting against suppression, the judge found that the actions of the police officers were justified because (1) the encounter occurred in a high crime area where several firearms incidents recently had taken place; (2) the police officers had been told to patrol the area to prevent potential retaliation from the Randolph homicide the night before; (3) the defendant said he was from Randolph; (4) the police officers did not recognize the defendant, despite having patrolled the area for many years; (5) the defendant gave an implausible answer about having come from a store; and (6) there had been a shooting incident nearby several hours earlier. Based on these factors, the judge concluded that the police officers were justified in seizing the defendant.[4] He also determined that the police officers were justified in pat frisking the defendant because, based on the same factors, the police officers had a reasonable basis for believing that the defendant "pose[d] a danger" to them. Therefore, the judge denied the defendant's motion to suppress.

c. *The Appeals Court's decision.* The Appeals Court affirmed the denial of the defendant's motion to suppress, but did so on slightly different grounds. Unlike the motion judge, the Appeals Court recognized that in the factual circumstances of this case,

---

[4]The judge did not articulate what test he applied to determine whether the seizure was permissible, other than that it was "reasonable."

the seizure of the defendant and the patfrisk could not be separated analytically. *Commonwealth* v. *Narcisse*, 73 Mass. App. Ct. 406, 408-409 (2008). Rather, what occurred was the sort of simultaneous seizure and search described in *Commonwealth* v. *Fraser*, 410 Mass. 541, 544 n.4 (1991) (*Fraser*), where the patdown was not preceded by a forcible stop. Thus, the Appeals Court shifted its focus from whether it was permissible to stop (or seize) the defendant to whether the police officers' concerns for their safety justified the escalation of the consensual encounter with the defendant to include a patfrisk. *Commonwealth* v. *Narcisse*, *supra* at 408-410. Reviewing the same factors as the motion judge, the Appeals Court held that "each element may not have been enough to warrant police intervention, but when considered together, the general environmental factors and the defendant's responses to police questioning gave rise to the officer's reasonable fear that the defendant might have a weapon." *Id.* at 410.

2. *Discussion.* Absent clear error, we accept and adopt the findings of the motion judge, but we "independently determine the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *DePeiza*, 449 Mass. 367, 369 (2007) (*DePeiza*), quoting *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 50 (2004). Here, the Commonwealth has not carried its burden to demonstrate that the police officers' stop and frisk of the defendant were justified by a reasonable suspicion that the defendant was engaged in criminal activity and that he was armed and dangerous. *DePeiza*, *supra* at 374. Accordingly, we reverse.

We begin by determining when the defendant was seized. See *DePeiza*, *supra* at 369. "Not every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions that requires justification." *Commonwealth* v. *Gomes*, 453 Mass. 506, 510 (2009). "The particular character of such an encounter will determine" what level of justification, if any, is required. *Commonwealth* v. *Lyles*, 453 Mass. 811, 814 (2009). Thus, police officers may approach individuals on the street to ask them about their business without implicating the balance between State power and individual freedom. See *Florida* v. *Bostick*, 501 U.S. 429, 434

(1991), quoting *Florida* v. *Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or another public place"); *Commonwealth* v. *Lyles, supra* at 815, and cases cited. Such interactions, field interrogation observations, see note 1, *supra*, properly are deemed consensual encounters because the individual approached remains free to terminate the conversation at will. See *id.* at 814-815. That is, they are constitutionally insignificant, and a police officer may initiate such an encounter without any information indicating that the individual has been or is presently engaged in criminal activity.

With this in mind, and contrary to the defendant's contention, the officers in this case did not exceed the bounds of a consensual field interrogation observation when they pulled alongside the defendant and got out of their vehicle. The evidence reveals that the officers engaged in a brief, albeit unspecified, conversation with the defendant and his companion after they got out of their cruiser, informing the men that there had been "activity" nearby and asking what the two men were doing in the area. This was a consensual encounter, not a seizure, because a reasonable person would have believed he was free to leave. *Commonwealth* v. *Gomes, supra* (defendant not seized when officers quickly approached him and engaged in short conversation); *DePeiza, supra* at 370 (same). However, once the officers told the defendant that they intended to pat frisk him, they seized his person within the meaning of the Fourth Amendment and art. 14. *DePeiza, supra* at 371 (defendant seized when officers announced their intention to frisk him).

We turn now to whether the officers possessed the requisite constitutional justification to seize the defendant after initiating a consensual encounter, as well as the necessary justification to frisk him.[5] See *Terry* v. *Ohio*, 392 U.S. 1, 30 (1968) (*Terry*); *Commonwealth* v. *Wilson*, 441 Mass. 390, 393-394 (2004). As

[5]While a police officer, like any citizen, may lawfully encounter and ask another person a question, such encounters are governed by significant limitations. *Terry* v. *Ohio*, 392 U.S. 1, 32 (1968) (Harlan, J., concurring) (*Terry*) ("in the absence of state authority, policemen have no more right to 'pat down' the outer clothing of passers-by, or of persons to whom they address casual questions, than does any other citizen"). As Justice Harlan wrote

the Supreme Court of the United States recently reaffirmed, a "stop and frisk [is] constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona* v. *Johnson,* 129 S. Ct. 781, 784 (2009). This is true even where the officer comes into contact with an individual solely to conduct a consensual interview. See *United States* v. *Burton,* 228 F.3d 524, 527 (4th Cir. 2000), quoting *United States* v. *Sokolow,* 490 U.S. 1, 7 (1989) ("A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a 'reasonable suspicion supported by articulable facts that criminal activity "may be afoot" ' ").

In this case, the Appeals Court did not analyze the stop and frisk of the defendant to ensure that both the stop *and* the frisk were justified. Of particular concern is its reliance on our decision in *Fraser* to hold that a reasonable suspicion of criminal activity is not required before subjecting an individual to a protective frisk during a consensual encounter. *Commonwealth* v. *Narcisse,* 73 Mass. App. Ct. 406, 408-410 (2008), discussing *Fraser, supra,* and *Commonwealth* v. *Fisher,* 54 Mass. App. Ct. 41, 44 (2002). Although this interpretation is not inconsistent with the language contained in a footnote in *Fraser,* it is nonetheless incorrect.

In *Fraser,* we said that the circumstances of the case were "anomalous" because "the pat-down of the defendant was not preceded by a forcible stop, the prototypical situation addressed

in his concurrence in *Terry, supra* at 32-33, the right of a police officer to frisk someone in his presence depends on the right to be in his presence, and "[t]hat right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection." See 4 W.R. LaFave, Search and Seizure § 9.6(a), at 617 (4th ed. 2004) ("if an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed").

in *Terry.*" *Fraser, supra* at 544 n.4. However, as the present case suggests, "anomalous" was not a well-chosen adjective. As reflected in decisions of this court and the Appeals Court, as well as of courts in other jurisdictions, consensual encounters between police officers and citizens frequently escalate to the point of a search without being preceded by an analytically distinct stop. See, e.g., *Commonwealth* v. *Fisher, supra*; *Commonwealth* v. *Foster,* 48 Mass. App. Ct. 671, 673-674 (2000); *United States* v. *Orman,* 486 F.3d 1170, 1174 (9th Cir. 2007), cert. denied, 552 U.S. 1313 (2008); *United States* v. *Burton, supra* at 526-527, 528; *United States* v. *Gray,* 213 F.3d 998, 1000 (8th Cir. 2000); *United States* v. *Davis,* 202 F.3d 1060, 1063 (8th Cir.), cert. denied, 531 U.S. 883 (2000). Thus, experience reveals that the exigencies of real life police-citizen encounters often blur the tidiness of the two-pronged *Terry* analysis, and that it is time to reposition *Fraser* in the familiar *Terry* framework.

In *Fraser, supra* at 542, a police officer responded to a radio call reporting that there was "a man with a gun inside a brown Toyota at 35 High Street." When the police responded to the scene, which was in a high crime area, the brown Toyota vehicle was gone, but the defendant stood among a group of young men at that location. *Id.* As one of two officers got out of the unmarked police vehicle to investigate, he saw the defendant bend down behind a vehicle "as though to pick something up or put something down." *Id.* The officer walked over to the defendant, identified himself as a police officer, and asked him to remove his hands from his pockets, which the defendant refused to do. *Id.* at 542-543 & n.2. The officer then pat frisked the defendant and recovered a loaded handgun, for which the defendant had no license to carry. *Id.* at 542-543.

Examining only whether the officer reasonably believed that the defendant was armed and posed a danger to the officer and others nearby, we concluded that the patfrisk, which was not preceded by a stop, did not violate that defendant's Fourth Amendment rights. *Id.* at 544-546 & n.4. We determined that the officer reasonably believed that his safety and the safety of others were at risk based on four factors: "(1) the radio call describing a man with a gun; (2) the fact that the encounter occurred in a 'high crime area'; (3) the defendant's bending down

behind [a] truck 'as though to pick something up or put something down'; and (4) the fact that at all critical times the defendant kept his hands in his pockets [despite being asked by the officer to remove them]." *Id.* at 545.

We did not address whether the officer could have reasonably believed that the defendant was engaged or about to engage in criminal activity, and disavow any suggestion in *Fraser* that we were establishing a new or lesser standard in our stop and frisk jurisprudence. We have since pointed out that "decisions in these cases are highly fact specific" and that "[t]oo broad an application of this exception [in *Fraser*] would undercut the important principle that intrusions on a citizen's liberty must ordinarily be based on reasonable suspicion that criminal activity is afoot." *Commonwealth* v. *Knowles*, 451 Mass. 91, 99 (2008).

Today we mark the end of *Fraser*'s role as an exception, and we state expressly that police officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense *and* is armed and dangerous.[6] However, this is not to say that such suspicions must arise sequentially; it is clear that they may occur simultaneously. In such cases, a reasonable belief that an individual has a weapon and appears inclined to use it acts to satisfy both prongs of the *Terry* analysis. When an individual appears to be ready to commit violence, either against police officers or bystanders, it is reasonable to believe that he is "about to commit a crime," thus

---

[6]There are, of course, circumstances other than consensual encounters in which police officers may pat frisk a person in the absence of a reasonable suspicion that the person is (or has been) engaged in criminal activity. For example, the police may perform a protective patfrisk on a person who is in the company of a person being arrested and whom the officer reasonably believes may be armed and dangerous. See *Commonwealth* v. *Johnson*, 454 Mass. 159, 162-164 (2009) (patfrisk of defendant proper where he was with person being arrested for trespassing and he made furtive movements). See also *Maryland* v. *Buie*, 494 U.S. 325, 332-333, 335 (1990) (when making in-home arrest police can conduct "protective sweep" of home when they possess reasonable belief that individuals may be present who would pose danger to officers on scene); 4 W.R. LaFave, *supra* at § 9.6(a), at 634-638, and cases cited. Our holding today is limited to those circumstances where the police escalate a consensual encounter into a search without first effectuating a seizure, that is, the "anomalous" situation discussed in *Commonwealth* v. *Fraser*, 410 Mass. 541, 544 n.4 (1991).

satisfying *Terry*'s first prong. *Commonwealth* v. *Wilson*, 441 Mass. 390, 394 (2004). See *Terry*, *supra* at 30 (criminal activity "afoot"). Moreover, the individual's conduct simultaneously gives rise to a reasonable belief that he is armed and dangerous, satisfying the second. See *id.*[7]

The *Fraser* case fits within this analysis. Having responded to a scene where they reasonably believed a gun was likely to be present, the police officers could fairly interpret the defendant's furtive conduct of bending down as though picking up something, followed by his refusal to remove his hands from his pockets, as evidence that the defendant had armed himself and was about to undertake some action against them with a weapon. These circumstances justified the escalation of the encounter. We have implicitly applied this analysis in other cases as well. Compare *Commonwealth* v. *Knowles*, *supra* (defendant "did nothing to suggest that he might be attempting to secure or draw a weapon"), with *Commonwealth* v. *Pagan*, 63 Mass. App. Ct. 780, 783 (2005) (defendant reached for waistband indicating he "might be drawing or concealing a weapon").

Courts that have considered whether a patfrisk search may be conducted in the absence of both *Terry* requirements largely have reached the same conclusion that we do in this case. In *United States* v. *Burton*, 228 F.3d 524 (4th Cir. 2000), the court suppressed evidence seized during a patfrisk of an individual during an encounter with police on the street. The police officers were serving outstanding warrants in the area when they

---

[7]Of course, the first prong of *Terry* does not require reasonable suspicion that the individual is engaged or is about to engage in a crime of violence. It is satisfied by a reasonable suspicion that an individual has committed, is committing, or is about to commit *any* criminal offense. However, where the first prong is satisfied and the crime is one of violence or of the type for which the offender would likely be armed (including the unlawful carrying of a firearm), little more is required after the stop to justify a protective frisk. See, e.g., *Terry*, *supra* at 28 (officer justified in performing stop and frisk after observing individuals preparing for likely "stick-up"); *United States ex rel. Richardson* v. *Rundle*, 461 F.2d 860, 863-864 (3d Cir. 1972), cert. denied, 410 U.S. 911 (1973) (robber in Philadelphia likely to be armed); *Commonwealth* v. *DePeiza*, 449 Mass. 367, 374 (2007) (same for person seized on reasonable suspicion of unlawfully carrying firearm). If the basis for the stop does not involve such a crime, the second prong of *Terry* would require additional facts and circumstances to support the belief the individual is armed and dangerous.

observed the defendant standing at a public telephone. *Id.* at 526. They approached him and asked for identification. *Id.* The defendant did not respond and remained mute. *Id.* The officers then asked him to remove his right hand from his coat pocket, and the defendant failed to do so. *Id.* Feeling "uneasy" about his safety at this juncture, one of the officers thrust his hands into the defendant's coat pocket; a struggle ensued and a handgun was recovered. *Id.* On appeal, the prosecution argued that in police-citizen encounters, officers may conduct a limited search for weapons when they believe their safety may be in danger, regardless of whether they have a reasonable suspicion of criminal activity. *Id.* at 527. The court rejected the argument, reiterating the requirement of *Terry*, *supra* at 32-33, and *Adams* v. *Williams*, 407 U.S. 143, 146 (1972), that "during such police-citizen encounters an officer is not entitled, without additional justification, to conduct a protective search. To conduct such a protective search, an officer must first have reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States* v. *Burton*, *supra* at 528. The court went on to hold that a citizen's refusal to answer questions and to take his hands out of his pockets was not enough. "[A]n individual's 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for detention or seizure.' " *Id.* at 529, quoting *Florida* v. *Bostick*, 501 U.S. 429, 437 (1991).

Similarly, in *United States* v. *Gray*, 213 F.3d 998 (8th Cir. 2000), the court reversed the denial of a motion to suppress evidence seized in a patfrisk conducted during the course of routine questioning of a man observed at 9:45 P.M. on the street in an area of the city known for drug activity and prostitution. The man crossed the street in a "hurried fashion" when he appeared to notice the police cruiser. *Id.* at 1000. The officers eventually stopped and approached him, and he voluntarily identified himself and told the police that he lived nearby and was waiting for a friend. *Id.* The police thought it was odd for the man to be waiting outside in the cold when he could have waited at the residence. *Id.* at 1001. They also suspected, based on the similarity of names, that he might have been related to a gang member recently murdered in the area. *Id.* Based on those circumstances, the police, being concerned for their safety,

conducted a patfrisk and recovered a handgun. *Id.* at 1000. In suppressing the evidence, the court underscored the dual requirements of a reasonable suspicion of criminal activity as well as a reasonable belief that the defendant may be armed and dangerous. *Id.* It went on to note that the "requirement that a protective frisk be based upon reasonable suspicion that criminal activity is afoot explains why this type of search is normally preceded by an investigative stop based upon an officer's reasonable suspicion of criminal activity." *Id.* While acknowledging that police officers were free to approach any citizen and ask questions, the court stated that unless such an encounter produces a reasonable suspicion of criminal activity, a pat-down search cannot be justified, and what occurred in that case did not come close to the threshold. *Id.* Contrast *United States* v. *Ellis,* 501 F.3d 958, 962 (8th Cir. 2007) (defendant's conduct when police, with consent, entered house, including moving his hand toward his pocket and physically pushing officer in attempt to leave scene, justified seizure and pat-down); *United States* v. *Davis,* 202 F.3d 1060, 1063 (8th Cir. 2000) (defendant's conduct during consensual encounter "crystallize[d] previously unconfirmed suspicions of criminal activity and [gave] rise to legitimate concerns for officer safety").

Returning to the case at hand, the defendant clearly did not manifest behavior that indicated that he was engaged in criminal activity or that he was armed and dangerous. As the motion judge found, neither the defendant nor his companion did anything that would arouse suspicion that criminal activity was "afoot," including the possibility that they posed a present threat to the officers themselves. See *United States* v. *Burton, supra* at 529 (no evidence defendant "made any moves"). Indeed, the men did not even appear to be armed. Contrast *DePeiza, supra* at 371 (defendant walked in manner suggesting he was carrying gun and proceeded to shield his side from officers' view); *Fraser, supra* at 542 (defendant bent down as if to pick something up and refused to remove hands from pockets). Moreover, the only connection between the two men and the murder in Randolph was the defendant's stated residence, which was, at best, a tenuous link. See *Commonwealth* v. *Cheek,* 413 Mass. 492, 496 (1992) (proximity to scene of crime, without more, insuf-

ficient basis for investigatory stop); *United States* v. *Gray, supra* at 1001, quoting *United States* v. *Eustaquio*, 198 F.3d 1068, 1071 (8th Cir. 1999) (discussing defendant who was found in high crime area and who crossed street when he saw police, and concluding that "[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity"). Nothing connected the men to the shooting on East Street, and the defendant's implausible answer indicated no more than minor fabrication. Additionally, what the Appeals Court called "general environmental factors," *Commonwealth* v. *Narcisse*, 73 Mass. App. Ct. 406, 410 (2008), such as the defendant's presence in a high crime area and the heightened concern about retaliatory violence after the murder in Randolph, were not enough to suggest that the *defendant* was engaged in criminal activity or that he was armed and dangerous. Finally, taken as a whole, these general "environmental" concerns, combined with the specific conduct of the defendant and his companion, could not satisfy either *Terry* prong. While such factors provided the officers with ample reason to approach the defendant to ask him about his business for being in the area, nothing the defendant or his companion did or said justified an escalation of the encounter. See 4 W.R. LaFave, Search and Seizure § 9.6(a), at 617 (4th ed. 2004).

3. *Conclusion.* The order denying the defendant's motion to suppress is vacated, and an order shall be entered allowing that motion. The evidence obtained as a result of the illegal seizure must be excluded. The case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*