Macdonald, D. Lloyd, J.
The motion to suppress (Paper #10) is Allowed.
At issue is the lawfulness of the stop of the defendant several minutes after a knife-point robbeiy.
Facts
The robbery occurred at approximately 6:25 p.m. on November 6, 2009 on the premises of the Globe Car Wash at 250 Broadway in Fall River. It was dark, and the weather was cold.
The radio broadcast after the robbeiy described the suspect as “dark skinned” and wearing a “black hoody” and running North on Broadway. Another transmission over the radio described the suspect’s race as “uncertain.” The victim told the first responding police officer that the suspect looked “Hispanic” but he wasn’t sure. He further described him as 5’7"-5’9."[1]
After responding to the scene of the robbeiy and obtaining information from the first responding officer (see footnote 1 below), Officer Jose Barbosa (“Bar-bosa”) proceeded in his cruiser north on South Main Street and then turned right, easterly, onto Peckham Street. On the northerly side of Peckham Street, two or three houses in from South Main Street, Barbosa saw the defendant walking towards him. The defendant is 6’2" tall and is an African American with dark black skin. The defendant was wearing a dark hoody.
The direction the defendant was walking on Peckham Street was substantially in the direction of the Globe Car Wash where the robbeiy had occurred. (The streets in the area tend to intersect on diagonals, so the defendant was not going directly toward the crime scene.) The Globe CarWash was approximately two blocks away from where the defendant was stopped. See street map as Exhibit 1.
Peckham Street is populated with a diverse mix of ethnic groups, including a substantial number of Hispanic and African American residents. It is considered a high crime area in Fall River.
Barbosa stopped his cruiser and called to the defendant to come over to the cruiser. He informed the defendant that he matched the description of a person who had just committed a robbeiy. The defendant responded by putting his hands up in the air and saying, “I didn’t do it, sir.”
Barbosa then instructed the defendant to put his hands on the cruiser so that he could be frisked. Barbosa believed that his safety was at risk because of a knife having been employed in the robbeiy and because of the high crime character of the neighborhood. However, before Barbosa could execute the frisk, the defendant, with the palms of his hands, forcefully pushed Barbosa away and fled easterly on Peckham Street.
Meanwhile, a backup officer arrived in another cruiser and pursued the defendant. The pursuing officer demanded that that the defendant stop. He then warned the defendant that he would “Taser” him if the defendant did not stop. The defendant did not, and he was Tasered. The defendant fell to the ground, temporarily immobilized by the Taser shock.[2]
The defendant was then handcuffed. The defendant spontaneously informed the officer who handcuffed him that he had no weapon but that he did have “some drugs.” The search of his bulging pocket disclosed one bag of crack cocaine and one of powdered cocaine. It is that evidence that the defendant seeks to suppress.
The victim of the robbeiy was then brought to where the defendant was in custody on Peckham Street for a show-up. The victim promptly informed the officers that the defendant was not the robber.
Discussion
When Barbosa instructed the defendant to come over to the cruiser and to be frisked, he “seized” the defendant. Commonwealth v. Narcisse, 457 Mass. 1, 6 (2010). A stop and frisk under these circumstances is justified only if there are objective articulable reasons to suspect that the person committed or was about to commit a crime and that he was armed and dangerous. Commonwealth v. Gomes, 453 Mass. 506, 512 (2009). Here, on account of a knife having been employed in the reported robbeiy, Barbosa had more than sufficient reasons to justify the frisk; however, he did not have an objective basis to reasonably suspect the defendant of that robbery.
Barbosa knew that the suspect had been reported to be running away from the scene of the robbeiy, and yet the defendant was observed minutes after the robbeiy walking toward the crime scene from an area away from the area to which the defendant was last reported to have been running.
Further, while the defendant was wearing a dark hoody, hoodies are common items of clothing for young men in the Peckham Street neighborhood (and most other similar neighborhoods in the Commonwealth).
*588 Other than the hoody, the defendant did not match the description of the assailant: the defendant was substantially taller, and there was no ambiguity about his black (as opposed to “dark”) skin color, nor as to his being African American rather than Hispanic in appearance. The high crime nature of the Peckham Street neighborhood would have only marginal relevance to a determination of a lawful frisk. See, e.g., Commonwealth v. Cheek, 413 Mass. 492, 496 (1992). It is irrelevant to whether a stop is justified. Cf. Commonwealth v. Mubdi, 456 Mass. 385, 398 (2010).
The defendant’s forceful pushing away of Officer Barbosa when the defendant was about to be frisked would otherwise comprise an assault and batteiy that would have justified his arrest and search incident to arrest. However, because the defendant had been unlawfully seized prior to the attempted frisk, the evidence must be suppressed as “fruit of the poisonous tree.” See Commonwealth v. Borges, 395 Mass. 788, 795-96 (1985), and Commonwealth v. Bishop, 402 Mass. 449, 451-52 (1988).
ORDER
The defendant’s motion to suppress is ALLOWED.

 The police officer who stopped the defendant (Officer Barbosa) testified that he was informed by the officer who first responded to the crime scene that the victim described the suspect as “tall.” However, in the first responding officer’s report of the robbery the victim described the suspect’s height to be 5’7"-5’9." Exhibit 2. The radio broadcast had no reference to the suspect’s height. On the full evidentiary record, the Court concludes that Officer Barbosa was mistaken (but in good faith) as to his receipt of information as to the suspect being “tall.”

 A Taser is a stun-gun that employs small fishhook-like projectiles that are wire-tethered to a battery pack in the gun. It has a 21-foot range, and once the barbed projectiles make skin contact, the Taser administers a high-voltage shock.