COMMONWEALTH *VS.* JOSE D. FAMANIA.

No. 09-P-745.

Hampden. March 11, 2010. - April 28, 2011.

Present: TRAINOR, WOLOHOJIAN, & MILKEY, JJ.

*Firearms. Practice, Criminal,* Motion to suppress. *Constitutional Law,* Stop and frisk, Reasonable suspicion. *Search and Seizure,* Protective frisk, Reasonable suspicion.

A District Court judge correctly denied a criminal defendant's pretrial motion to suppress ammunition discovered inside a backpack taken from him by police when, after officers approached the defendant while responding to an anonymous tip of a man with a gun, the defendant started to back away and take the backpack off, where, although the anonymous tip alone did not provide reasonable suspicion to seize him, it provided the officers ample authority to approach him with some basis for believing that he in particular was armed, and the police made a reasonable judgment based on his actions that they could not let him have easy access to the specific location where the gun was alleged to be. [368-373]

COMPLAINT received and sworn to in the Springfield Division of the District Court Department on September 26, 2007.

A pretrial motion to suppress evidence was heard by *Jacques C. Leroy*, J., and the case was heard by *M. John Schubert, Jr.*, J.

After review by the Appeals Court, the Supreme Judicial Court denied leave to obtain further appellate review, but remanded the case to the Appeals Court for reconsideration.

*Thomas D. Frothingham* for the defendant.

*Sidney E. Reavey*, Assistant District Attorney, for the Commonwealth.

MILKEY, J. Following a bench trial in District Court, the defendant was convicted of carrying ammunition without a firearm identification card in violation of G. L. c. 269, § 10(*h*). On appeal, he argued that the police found the ammunition through an unlawful search and that the judge therefore should

have allowed his motion to suppress this evidence.[1] In an unpublished decision issued pursuant to Appeals Court Rule 1:28, we affirmed. 76 Mass. App. Ct. 1126 (2010). By order dated December 30, 2010, the Supreme Judicial Court denied the defendant's application for further appellate review without prejudice, but remanded the case to this court for reconsideration in light of *Commonwealth* v. *Narcisse*, 457 Mass. 1 (2010), and *Commonwealth* v. *Martin*, 457 Mass. 14 (2010). *Commonwealth* v. *Famania*, 458 Mass. 1112 (2010). Having reconsidered the case in light of *Narcisse* and *Martin*, we affirm.

*Background.* "In reviewing the denial of a motion to suppress, we accept the judge's findings of fact absent clear error." *Commonwealth* v. *Mubdi*, 456 Mass. 385, 388 (2010), quoting from *Commonwealth* v. *Damian D.*, 434 Mass. 725, 726 (2001). As the defendant has not shown any of the judge's findings to be clearly erroneous, we state the facts as drawn from those findings. We then proceed "to determine 'the correctness of the judge's application of constitutional principles to the facts as found.' " *Ibid.*, quoting from *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

While in their cruiser on a routine patrol, two Springfield police officers overheard a dispatch call "regarding a tall, black male wearing blue jeans, a black shirt with a black backpack." The call stated that the man was walking on Liberty Street away from the bus station located there and that he had a handgun in his backpack.[2] Because they were in the immediate vicinity, the officers decided to see if they could locate the man, and they proceeded down Liberty Street toward the bus station. They spotted someone fitting the man's description walking along Liberty Street away from the bus station. The officers turned their cruiser around, stopped behind the subject, exited from the cruiser, walked up to the subject and one of the officers

---

[1]The ammunition was found inside a gun. The defendant faced additional charges related to the gun, but was found not guilty of those charges after he contested the gun's operability.

[2]The judge observed that the specific area in question was "a well frequented commercial area in downtown Springfield." Without specifically characterizing it as a "high crime area," he noted that the police officer who testified "had performed hundreds of arrests there, arrests involving narcotics and crimes of violence committed with various dangerous weapons."

asked him: "Hey, can I talk to you for a minute?" After approaching the man, the officers stood "maybe about five feet" from him, and, as the judge found, they did not "display[] any excessive sign of authority."[3]

According to the testimony of one of the officers, whom the judge found credible, the defendant "seemed hesitant," his "eyes were wide," and he "kind of started stepping back slowly and looking over his shoulders, looking around." The judge noted that "[b]ased on his experience of some thirteen years with the Springfield [p]olice [d]epartment," the officer "formed the impression that [the defendant] was 'looking for a way to flee, a route to flee.' " The defendant then "slightly shuffling backwards, stepping away, began to reach up to the backpack's shoulder straps, starting to take it off." The officer "concluded that he could not allow [the defendant] to 'take that backpack off where [the defendant] would have had easier access directly into the bag where a gun would have been.' " The police then seized the defendant and "took possession of the backpack."

The backpack was made of "very thin, soft leather," and the officer who took possession of it "could feel the distinct shape of what he thought was a handgun." He proceeded to open the backpack and found a loaded handgun inside.[4] The officers asked the defendant "whether he had a license to carry or an F.I.D. card," and he admitted he did not. They then placed him under arrest.

The defendant moved to suppress the evidence found in his backpack. The motion judge concluded that the defendant was not "seized" when the officers initially stopped to question him, and he noted that the defendant conceded that point. While

[3]This finding appears to be based on testimony from one of the officers that the police did not activate their lights or siren and did not draw their guns.

[4]Although the motion judge made no findings on the exact sequence of events, the testimony was that at the point the defendant started to take off his backpack, the police "took control" of the defendant, "[p]laced him on the hood of [their] vehicle," and while one of the officers held the defendant down, the other "slowly took the backpack off." A third officer then arrived to help restrain the defendant, and the officer with the backpack "walked to the other side of the hood and looked into the backpack and right there [he] could see a black handgun." The officer felt the gun through the backpack's leather before he opened it; whether this occurred while the officer was taking the backpack off of the defendant or later is not clear.

the judge concluded that the police did seize the defendant as soon as he started to take his backpack off, he rejected the defendant's argument that this "seizure had no constitutional justification." He reasoned as follows:

> "The tip provided the dispatcher, though from an unidentified informant, so accurately described Famania that I find it to reflect a reliable basis of knowledge on the part of the informant, thus warranting the initial stop.

> "The circumstances that followed evolved rapidly, and Zollo and Feliciano had to react with experienced quickness. Because of Famania's demeanor and behavior, and based upon Zollo's long experience and great familiarity with the area, I have concluded that Famania's seizure was justified."

*Discussion.* The point at which the defendant was seized has never been in dispute. The defendant concedes that he was not seized when the police initially approached him without any appreciable show of force,[5] and the Commonwealth concedes that the police seized him when he began to take his backpack off. In our initial decision, we concluded that the police seized the defendant out of a reasonable concern for their safety. On this basis, we ruled that the search of the backpack was justified "[r]egardless of whether the tip that someone whose description fit that of the defendant was carrying a gun in his backpack provided a sufficient basis for the police to seize him." Our conclusion in this regard was expressly based on our understanding of *Commonwealth* v. *Fraser*, 410 Mass. 541 (1991).

In *Narcisse*, the Supreme Judicial Court acknowledged that *Fraser* could be interpreted as we did in this case. 457 Mass. at 7. However, the court held that this reading of *Fraser* was incorrect, and it clarified "that police officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense *and* is armed and dangerous." *Id.* at 9. See *Martin*, 457 Mass. at 19-20. The court

---

[5]Compare *Commonwealth* v. *Depina*, 456 Mass. 238, 242 (2010) (show of force coupled with a "come over here" request constituted a seizure).

emphasized that such suspicions need not occur sequentially and that "a reasonable belief that an individual has a weapon and appears inclined to use it acts to satisfy both prongs of the *Terry* [v. *Ohio*][6] analysis." *Narcisse, supra.* While abrogating some of the language it had employed in *Fraser,* the court notably did not overrule that case. To the contrary, *Narcisse* reaffirmed the result reached in *Fraser* but clarified the proper analysis to use when confronted with the type of encounter as that in *Frasier. Ibid.* Specifically, after laying out how an individual's conduct could simultaneously create a reasonable suspicion both that criminal activity was afoot and that a suspect was armed and dangerous, the court stated the following:

> "The *Fraser* case fits within this analysis. Having responded to a scene where they reasonably believed a gun was likely to be present, the police officers could fairly interpret the defendant's furtive conduct of bending down as though picking up something, followed by his refusal to remove his hands from his pockets, as evidence that the defendant had armed himself and was about to undertake some action against them with a weapon. These circumstances justified the escalation of the encounter."

*Narcisse,* 457 Mass. at 10. With this as a backdrop, we turn to the question whether the police here had the requisite reasonable suspicion to conduct a protective frisk of the defendant at the time they did so.[7]

---

[6]*Terry* v. *Ohio,* 392 U.S. 1 (1968).

[7]Here, it is not clear whether the police first felt the gun through the leather of the backpack as the bag was being taken off the defendant, or only after it was separated from him. See note 4, *supra.* In either event, the nature, scope, and intent of the external examination of the backpack was similar to a pat-down of the defendant's person, and there is precedent to analyze it under that rubric. See *Commonwealth* v. *Pagan,* 440 Mass. 62, 69-73 (2003). In *Pagan,* during a lawful *Terry* stop the police searched the backpack for weapons after the defendant had handed it to them and before they were about to return it to him. Although the police search was more intrusive than a simple pat-down of the backpack, the police were justified in doing so because from the outside of the bag they were able to ascertain only that it contained "heavy, hard objects." See also *Commonwealth* v. *Johnson,* 36 Mass. App. Ct. 336, 337-338 (1994) (officer could pat-down purse suspect was carrying). Cf. *Commonwealth* v. *Emuakpor,* 57 Mass. App. Ct. 192, 200 n.7 (2003) (patfrisk may extend to protective search of automobile's interior).

We begin by examining the information on which the police originally relied, the overheard dispatch call. There was no information about who provided the tip on which the call was based, or under what circumstances the information was relayed. Thus, "we do not know and cannot learn who called, and cannot discern the motive or state of mind of the caller." *Mubdi*, 456 Mass. at 397. While acknowledging that the dispatch call did not identify the tipster (and that therefore the source would have to be treated as anonymous), the motion judge nevertheless concluded that the tip "so accurately described [the defendant] that I find it to reflect a reliable basis of knowledge on the part of the informant." As set forth below, this analysis is inconsistent with the case law.

It is certainly true that under some circumstances, "the reliability of an anonymous caller may be demonstrated by police corroboration of the information provided." *Ibid.*, citing *Commonwealth* v. *Alvarado*, 423 Mass. 266, 271-272 (1996). However, the case law establishes a distinction between corroboration of details regarding the identity of the person whom the tipster has accused and corroboration of information about concealed criminal activity. As the United States Supreme Court has emphasized, "The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida* v. *J.L.*, 529 U.S. 266, 272 (2000). Thus, an anonymous tip that someone has a gun — regardless of how detailed it may be in identifying the person being accused — is not "without more, sufficient to justify a police officer's stop and frisk of that person." *Id.* at 268.[8]

The Supreme Judicial Court has also emphasized that police corroboration of the identity and location of the person whom an anonymous tipster has accused, by itself, has limited value. See *Mubdi*, *supra*. In that case, the police had received an anonymous tip regarding a reported gun transaction involving two black males in a specifically identified car. In following up on the tip, "the police confirmed that the caller was accurate in describing the location of the vehicle and the number of men

---

[8]In *Florida* v. *J.L.*, the anonymous caller had reported to police "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268.

inside." The court held that this was insufficient given that all the police were able to confirm were "innocent facts, all of which could have been observed by anyone at or around the location of the automobile." *Ibid.* The court also emphasized that the tip did not predict the defendant's behavior in a manner that might have allowed police corroboration of the predicted behavior to "demonstrate the caller's inside knowledge of the suspects' activities." *Id.* at 397-398, citing *Commonwealth* v. *Bakoian*, 412 Mass. 295, 302 (1992); *Commonwealth* v. *Lyons*, 409 Mass. 16, 22 (1990). In addition, the Supreme Judicial Court has highlighted that "[c]arrying a gun is not a crime. Carrying a firearm without a license (or other authorization) is." *Alvarado, supra* at 269. For all of these reasons, it is now well established that "[a]n anonymous tip that someone is carrying a gun does not, without more, constitute reasonable suspicion to conduct a stop and frisk of that individual" (footnote omitted). *Commonwealth* v. *Barros*, 435 Mass. 171, 177 (2001).

Accordingly, there can be little doubt that the dispatch call that the police officers overheard could not alone provide them reasonable suspicion sufficient to seize the defendant.[9] However, the police did not seize the defendant based on the dispatch call alone. Instead, they seized him only after having observed him during their on street encounter. The question we face is whether those observations, in combination with the information they had received from the anonymous tip, provided them with the requisite reasonable suspicion.[10] Although we find this question close, we conclude that it does.

While the anonymous tip alone did not provide the police

[9]The information in the dispatch call described "a tall, black male wearing blue jeans, a black shirt with a black backpack" walking up Liberty Street away from the bus station. There was little unusual about the nature of the clothing described, nor about the fact that someone would be walking in the vicinity of a bus station carrying a backpack. The description here was, if anything, less particular than the descriptions at issue in either *Florida* v. *J.L.* or *Commonwealth* v. *Mubdi*. Moreover, as noted, those cases make it plain that even great specificity regarding the identity of a suspect cannot by itself render an anonymous tip reliable.

[10]The fact that the anonymous tip is insufficient by itself to warrant a seizure does not mean that the information cannot be considered as part of the larger universe of information bearing on whether reasonable suspicion exists. It runs against the grain of common sense to say that police have to ignore the information they had.

with reasonable suspicion to seize the defendant, it provided them ample authority to approach him and to conduct what the Supreme Judicial Court recently termed a "field interrogation observation." See *Narcisse*, 457 Mass. at 3. Indeed, as the court said in *Fraser*, in an observation that remains valid today, "it would have been poor police work" not to investigate a report of an armed man. 410 Mass. 544 at n.4. See *Commonwealth* v. *Stoute*, 422 Mass. 782, 790 (1996) ("When a tip . . . concerns the possession of a firearm, it deserves the immediate attention of law enforcement officials"). Having validly approached the defendant with some basis for believing that he in particular was armed,[11] the police made a judgment that they could not let the defendant have easy access to the specific location where the gun was alleged to be. We believe that it was reasonable for the police to make that judgment even though the action that the defendant started to take, removing his backpack, could also be interpreted as an innocent gesture (or as a predicate to fleeing).[12]

Our analysis draws support from *Fraser*, as reinterpreted in *Narcisse*. That is, the facts here are broadly similar to those in *Fraser*, and we think that they provide a comparable level of support for the actions the police took. The defendant's taking off his backpack could perhaps be seen as less threatening than what the defendant had done in *Fraser* (bending down as though picking up something, followed by his refusal to remove his hands from his pockets). However, the police here had a significantly stronger basis for believing that the defendant was armed.[13] See *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41,

---

[11]In contrast, the police in neither *Narcisse* nor *Martin* had received tips that someone fitting the defendant's description was armed.

[12]With the benefit of twenty-twenty hindsight, it is possible to identify less intrusive steps that the police could have taken. For example, when the defendant began to remove his backpack, they could have initially directed him to refrain from doing so. However, as the motion judge noted, events unfolded quickly, and "we are loath to second guess" the snap judgments that police officers have to make in the field when their safety is at issue. *Commonwealth* v. *Cabrera*, 76 Mass. App. Ct. 341, 350 (2010). "[P]olice are 'not required to gamble with their personal safety.'" *Ibid.*, quoting from *Commonwealth* v. *Robbins*, 407 Mass. 147, 152 (1990).

[13]The tip at issue in *Fraser* reported a man with a gun who was inside a specific car at a certain address. When the police arrived at the referenced address, the car was gone. *Fraser, supra* at 542.

45 & n.5 (2002) (upholding search where defendant made "quick movement" "to" or "into" "his waist area" which was "particularly suggestive of a reach for a gun"); *Commonwealth* v. *Pagan*, 63 Mass. App. Ct. 780, 783 (2005) (upholding search where defendant reached for waistband indicating he "might be drawing or concealing a weapon"). Contrast *Commonwealth* v. *Knowles*, 451 Mass. 91, 99 (2008) (defendant "did nothing to suggest that he might be attempting to secure or draw a weapon"); *Commonwealth* v. *Martin*, 457 Mass. at 20 (defendant "made no furtive gestures").

In sum, we conclude that the Commonwealth was able to demonstrate that the police had reasonable suspicion to conclude both that the defendant was armed and dangerous and that he was about to draw the gun and was inclined to use it against them. See *Narcisse, supra* at 9. Accordingly, we also conclude that the motion judge was correct to deny the motion to suppress.

*Judgment affirmed.*