## COMMONWEALTH *vs.* DONALD G. RINGGARD.

No. 06-P-1347.

Worcester. December 4, 2007. - February 8, 2008.

Present: GRASSO, MILLS, & VUONO, JJ.

*Firearms. Constitutional Law,* Search and seizure. *Search and Seizure,* Emergency. *Practice, Criminal,* Argument by prosecutor, Instructions to jury.

A trial court judge did not err in denying a criminal defendant's motion to suppress evidence seized by police officers following their entry into the defendant's residence in response to a call reporting a possible house fire, where the entry was effected solely to avert a dangerous situation that threatened life or safety and not for criminal investigative purposes, and where the justifiable activities of the police led them to discover a firearm in plain view on the floor of the residence. [200-203]

No error, much less a substantial risk of a miscarriage of justice, arose from a statement in the prosecutor's closing argument suggesting that the testimony of the Commonwealth's witnesses was more credible than that of the defendant, where the statement was based on the evidence and the permissible inferences therefrom. [203]

At a criminal trial, the judge's misstatement in charging the jury on the requisite elements of illegal possession of a firearm was an obvious slip of the tongue that could not have misled or been misunderstood by a reasonable jury. [203-204]

COMPLAINT received and sworn to in the Worcester Division of the District Court Department on March 21, 2005.

A pretrial motion to suppress evidence was heard by *Dennis J. Brennan*, J., and the case was tried before *Austin T. Philbin*, J.

*Vincent F. Ricciardi* for the defendant.

*Donna-Marie Haran*, Assistant District Attorney, for the Commonwealth.

GRASSO, J. A jury found the defendant, Donald G. Ringgard, guilty of unlawful possession of a firearm, see G. L. c. 269,

§ 10(*h*).[1] On appeal, Ringgard maintains that the motion judge erred in denying his motion to suppress, and that the prosecutor's closing argument and the trial judge's instructions gave rise to a substantial risk of a miscarriage of justice. We affirm.

1. *The suppression motion.* We summarize the facts found by the motion judge, who heard testimony from Worcester police Officers Michael Foley and Steven Donnellan, fire department Lieutenant Daniel O'Neil, the defendant, and a friend of the defendant.[2] Where relevant, we supplement the judge's factual findings "with uncontested testimony from the suppression hearing, . . . mindful that assessment of witness credibility is the province of the motion judge." *Commonwealth* v. *Murphy*, 63 Mass. App. Ct. 11, 12 (2005).

In the predawn hours of March 19, 2005, a passerby called the Worcester police and reported an audible alarm sounding and a possible break-in at 760 Pleasant Street. The caller noted that a large glass window in the front door was missing. In response to a request from dispatch, Officers Foley and Donnellan went to the home in separate cruisers. Dispatch advised the officers that a possible fire was in progress and that a passing postal worker[3] had heard an alarm sounding.

On arriving at 760 Pleasant Street, the officers observed black smoke billowing from a large broken window in the front door of what appeared to be a single-family home. The officers ran to the door and looked through the broken window. Immediately inside, they saw a log lying on top of some broken glass. The log was similar to firewood that was stacked on the porch where the officers were standing. Looking further inside, the officers saw a hallway filled with smoke and an inner door that was ajar. Beyond the inner door was a kitchen where the officers saw flames coming out from around a stove. Standing

---

[1] At the close of the Commonwealth's case, the trial judge entered a required finding of not guilty on accompanying charges of assault and battery on a police officer, disorderly conduct, and disturbing the peace.

[2] Martha Wenisch, who lived with the defendant, was not present during the events in question. She testified to her observations of the condition of the residence upon her return the following day.

[3] Officer Foley testified that he was told by dispatch that the call had come from a postal worker, but Officer Donnellan recalled that dispatch reported the call as coming from a newspaper carrier who heard a house alarm ringing.

within a couple of feet of the flames was a man, later identified as the defendant.

The officers, who were in uniform, tried to get the defendant's attention by yelling, "Get out of the house. There's a fire. Is there anybody else here?" The defendant did not immediately acknowledge them or respond, so they yelled louder. When the defendant still did not open the door, the officers forced it open. As they did, the defendant began screaming obscenities at the officers, telling them to get out of his house.

When the officers entered, the defendant again yelled at them to get out of his house. In response, the officers escorted the defendant to the front porch and told him to remain seated. Donnellan then reentered the house to conduct a sweep of the dwelling for other occupants, alert them to the fire, and escort them to safety, if necessary. Meanwhile, Foley radioed a request for the fire department to respond to the scene. While the officers were so occupied, the defendant reentered the dwelling and screamed at the officers to "Get the fuck out of my house."

The officers again escorted the defendant out of the house and onto the porch because they were not "going to allow him to stay in a house that was on fire." At that point, Lieutenant O'Neil and two other firefighters arrived.[4] Just as the firefighters arrived, the defendant again attempted to reenter the residence, this time pushing Officer Donnellan in the process. A struggle ensued in which Donnellan and the defendant fell to a couch and then onto the floor, where the officers were finally able to apply handcuffs. In the course of subduing the defendant, the officers observed a .32 caliber handgun in plain view on the floor between the couch and a coffee table.[5] The handgun was later found to be loaded with five live rounds and one spent round.

While the officers were struggling with the defendant, O'Neil and the firefighters entered the residence from the front door. O'Neil observed broken glass in the hall, flames in the area of

---

[4]Lieutenant O'Neil testified that the fire dispatch occurred in response to a report from the newspaper carrier that a local alarm was going off. O'Neil related that a local alarm can mean anything from a smoke detector battery chirping to a cooking fire to a four-alarm fire with people jumping out windows.

[5]The defendant was asked for and could not produce a license to carry or a firearm identification card for the handgun.

the stove, and black smoke throughout the first floor. Once in the kitchen, the firefighters were able to douse the flames and extinguish the fire with only water from the sink.

After extinguishing the fire, the firefighters looked throughout the residence to ascertain whether anyone else was inside. By this time, the police officers and the defendant had already left the scene. Finding no other persons or pets present inside, the firefighters left.

The motion judge concluded that the officers' warrantless entry into the residence was reasonable under the circumstances.[6] We agree. The police entry into the residence was not a criminal investigatory search requiring a search warrant, but a function rendered necessary by the emergency situation that the police encountered. See *Commonwealth* v. *Bates,* 28 Mass. App. Ct. 217, 219-220 (1990) (emergency exception to search warrant requirement applies when purpose of entry is not to gather evidence of criminal activity, but to respond to immediate need for assistance for protection of life or property).

It has long been recognized that "a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency

---

[6]While the judge did not make a specific assessment of the credibility of the defendant's testimony, his factual findings, which support his ultimate conclusion of exigency, diverged in key aspects from the defendant's version of events. The defendant testified that he was a recovering alcoholic. On the day in question memories of a friend who had died caused him to slip. He had consumed a large number of beers and some shots of liquor both at home and at a nearby bar. On arriving home at around 2:30 A.M., he found himself without a house key. Grabbing a log on the porch, he threw it through the front window of the oak exterior door, and after cleaning the edges from the window, he climbed inside.

He began to prepare soup and a sandwich, but fell asleep. He awoke to his dogs barking, the fire alarm sounding, and the smell of smoke. Determining the stove to be the source of the smoke, the defendant grabbed a seat cushion to snuff out the fire, but the cushion ignited, a fact confirmed by O'Neil's later observation of a seat cushion in the oven. At that point, he heard the doorbell and noticed two officers standing outside the door. He engaged in conversation with the officers regarding who was in the house and how the door came to be broken, but they ordered him to open the door anyway. He couldn't locate the key at first, but did eventually, and the officers entered with his permission. At some point, the defendant tired of the officers and ordered them to leave numerous times, to no avail. Eventually, they arrested him.

aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne* v. *United States*, 318 F.2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963). The reason is plain: "People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Ibid.* See *Commonwealth* v. *Jung*, 420 Mass. 675, 681 (1995) ("It is beyond dispute that a burning building creates an exigency that justifies a warrantless entry by firefighters"). See also *Michigan* v. *Tyler*, 436 U.S. 499, 509 (1978). Cf. G. L. c. 148, §§ 3-5, detailing obligations of a firefighter to enter premises to investigate as to existence of conditions likely to cause fire.

Such was the case here. The officers were dispatched to 760 Pleasant Street because of a call reporting a broken front window and a possible fire. On their arrival, they immediately confirmed both reports. The window to the front door was broken, obviously the result of a log being thrown through it. Smoke and flames were visible inside. While the man they encountered claimed to be the owner, his claim of ownership and any lingering questions arising from the broken glass and the log in the hallway necessarily needed to await resolution of the more pressing concern of smoke and flames.

Viewed objectively, the circumstances confronting the officers amounted to a dangerous situation that threatened the life and safety of any occupants of the dwelling, and potentially others as well. The officers had reasonable grounds to believe that an emergency existed, and their actions were reasonable under the circumstances. See *Commonwealth* v. *Marchione*, 384 Mass. 8, 11-12 (1981) (warrantless entry into premises justified by emergency situation requiring immediate action for protection of life and property). Firefighters were not yet on the scene.[7] The visible smoke and flames, the full extent of which were uncertain, provided the officers with reasonable grounds to believe that an emergency existed. Accentuating the emergency was the defendant's unresponsiveness and hostility to police assistance. Prompt intervention was necessary to determine whether individuals

---

[7] Indeed, at that point the officers were not even aware that the fire department had been called.

besides the defendant were inside the dwelling and in need of immediate assistance from the imminent threat of death or serious injury posed by the smoke and fire.

Where, as here, the objective circumstances indicate that a house fire is underway, we will not second-guess the dangers posed. The full extent and severity of an apparent fire need not be subjected to chance. "[W]hether an exigency existed, and whether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981).

The officers' entries into the premises involved only a sweep of the premises for individuals and the repeated removal of the uncooperative and obstreperous defendant, not an exploratory or investigatory search of areas. In such cases, where the entry is effected solely to avert a dangerous situation that threatens life or safety and not for criminal investigative purposes, probable cause is not required under either the Fourth Amendment to the United States Constitution or art. 14 of the Declaration of Rights of the Massachusetts Constitution. See *Commonwealth* v. *Snell*, 428 Mass. 766, 776 n.7, cert. denied, 527 U.S. 1010 (1999). Nor were the officers required to permit the defendant to remain inside, or reenter, the dwelling, whether to engage in self-help in combating the fire or for another reason, thereby exposing responding firefighters to the additional concern of safeguarding an occupant. Even had the officers been confident that the defendant was, indeed, the owner, they were not required to permit him to endanger himself, as well as the officers and responding firefighters. Indeed, the repeated removal of the defendant from the premises was clearly a prudential measure designed to promote life and safety that was divorced from the detection, investigation, or acquisition of evidence relating to criminal activity. See *Cady* v. *Dombrowski*, 413 U.S. 433, 441 (1973); *Commonwealth* v. *Sondrini*, 48 Mass. App. Ct. 704, 706 (2000).

That the justifiable activities of the police led them to discover a firearm in plain view on the floor does not transform their endeavors into a criminal investigatory search. See *Common-*

*wealth* v. *Young*, 382 Mass. at 458. Once lawfully inside the premises to remove the defendant, the officers were entitled to seize the firearm, for which the defendant did not possess a firearm identification card, as evidence of a crime within plain view. See *Commonwealth* v. *Marchione*, 384 Mass. at 12.

2. *The prosecutor's closing.* In closing argument, the prosecutor stated, without objection, that the defendant should never have possessed the gun, and that the jury should find the officers' testimony more credible than that of the defendant. Viewing the prosecutor's closing "in light of the entire argument, the judge's instructions, and the evidence at trial," we discern no error, much less a substantial risk of a miscarriage of justice. *Commonwealth* v. *Burns*, 49 Mass. App. Ct. 677, 679 (2000). The prosecutor's argument was based on the evidence and permissible inferences. See *Commonwealth* v. *Johnson*, 429 Mass. 745, 750 (1999). The prosecutor did not overstep in analyzing the evidence and suggesting the conclusions the jurors should draw from the evidence, or in arguing why the officers' testimony should be believed in contrast to the defendant's. See *ibid.* "It is not improper to make a factually based argument that, due to the demeanor, disclosed circumstances, and appearance of a witness, a particular witness should be believed . . . ." *Commonwealth* v. *Kozec*, 399 Mass. 514, 521 (1987). Nor did the prosecutor vouch for the credibility of the Commonwealth's witnesses or express personal opinion or knowledge outside the evidence. See *Commonwealth* v. *Ortega*, 441 Mass. 170, 180-182 (2004).

Although not dispositive, the fact that the defendant did not object is some indication that the tone and manner of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial. See *Commonwealth* v. *Lyons*, 426 Mass. 466, 471 (1998). Moreover, the judge properly instructed the jury regarding the function of closing argument and the jury's role in assessing credibility and determining the facts. "We presume that a jury follow all instructions given to it." *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997).

3. *The jury instructions.* In charging the jury on the requisite elements of illegal possession of a firearm, the judge instructed, without objection, that the Commonwealth needed to prove that "the defendant knew that he possessed a firearm or had a firearm

under his control *in a vehicle*" (emphasis supplied). On appeal, the defendant contends that the inapposite inclusion of the reference to the defendant's having a firearm under his control "in a vehicle" gives rise to a substantial risk of a miscarriage of justice. We disagree.

"Jury instructions must be construed as a whole to prevent isolated misstatements or omissions from constituting reversible error where there is little chance that the jury would have misunderstood the correct import of the charge." *Commonwealth* v. *Oliveira*, 445 Mass. 837, 844 (2006). A mere slip of the tongue does not constitute a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Almonte*, 444 Mass. 511, 522-523, cert. denied, 546 U.S. 1040 (2005). Here, all the evidence, both the Commonwealth's and the defendant's, and the arguments of counsel pointed to the firearm being inside the defendant's home and nowhere else. The judge's misstatement was an obvious slip of the tongue that could not have misled or been misunderstood by a reasonable juror. See *Commonwealth* v. *Grant*, 418 Mass. 76, 84-85 (1994).

*Judgment affirmed.*