Commonwealth v. Cantelli.

COMMONWEALTH vs. PETER CANTELLI.

No. 11-P-405.

Norfolk. May 14, 2012. - January 24, 2013.

Present: RAPOZA, C.J., CYPHER, & MEADE, JJ.

*Infernal Machine. Firearms. Constitutional Law,* Search and seizure, Reason-
able suspicion, Right to bear arms. *Search and Seizure,* Emergency, Reason-
able suspicion, Plain view. *Evidence,* Firearm. *Practice, Criminal,* Motion
to suppress, Instructions to jury.

A Superior Court judge properly denied the criminal defendant's pretrial motion
to suppress evidence obtained when police officers entered his apartment,
where the officers were confronted with an emergency, in that the day before
their entry, explosive levels of gas had filled the defendant's apartment
because he had left the stove burner on, the defendant had been unable to
recognize the smell of gas, and he had defiantly refused to let a gas techni-
cian check the apartment, which led the management of the defendant's
apartment complex to file a civil complaint and seek a temporary restraining
order allowing management to enter the apartment to shut off the gas to the
stove; in that the defendant's actions in response to the officers' knocking at
his door, in conjunction with the officers' knowledge of the defendant's his-
tory of defiant behavior and his possession of firearms, created a reasonable
suspicion that when the defendant finally cracked the door open two inches,
he was armed, and therefore, it was reasonable for the officers to seize him,
secure him with handcuffs, and seat him in a chair until the purpose for their
visit could be accomplished; and in that, the officers lawfully being present
in the apartment, they properly could seize firearms and an explosive device
that were in plain sight. [163-169]

At the trial of an indictment charging the defendant with possession of an
infernal machine (an explosive device), the evidence, when viewed in the
light most favorable to the Commonwealth, was sufficient to permit a rational
trier of fact to concluded beyond a reasonable doubt that the explosive
device was capable of detonation. [169-171]

At the trial of indictments charging the defendant with improper storage of
firearms in his apartment, in violation of G. L. c. 140, § 131L(*a*), the
evidence was sufficient to permit a rational trier of fact to conclude beyond
a reasonable doubt that neither gun at issue was within the immediate
reach of, and therefore within the control of, the defendant [171-172];
further, there was no merit to the defendant's argument that the require-
ment in § 131L(*a*) that a firearm be under the defendant's control infringed
on his constitutional right to bear arms to protect himself [172-173].

At a criminal trial, an instruction to the jury that police officers has lawfully
entered the defendant's apartment did not improperly vouch for the cred-
ibility of the police. [173]

INDICTMENTS found and returned in the Superior Court Department on May 21, 2008.

A pretrial motion to suppress evidence was heard by *Kenneth J. Fishman*, J., and the cases were tried before *Wendie I. Gershengorn*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*Pamela Alford*, Assistant District Attorney, for the Commonwealth.

CYPHER, J. A jury convicted the defendant, Peter Cantelli, of possession of an infernal machine (explosive device), G. L. c. 266, § 102A,[1] and two counts of improper storage of a firearm, G. L. c. 140, § 131L(*a*), (*b*), and acquitted the defendant of two counts of improper storage of a firearm.[2] On appeal, the defendant argues that (1) the motion judge erred in denying his motion to suppress evidence obtained when the police entered his apartment; (2) the evidence was insufficient to support his convictions; (3) the element of "control" in the improper storage statute, as applied in these circumstances, infringed upon his right to self-defense under the Second Amendment to the United States Constitution; and (4) the trial judge improperly instructed the jury. We affirm.

1. *The motion to suppress.* a. *Background.* Prior to trial, the defendant moved to suppress the guns and explosive device seized when, according to the defendant, the police illegally entered his apartment on March 17, 2008. Police were at the defendant's apartment to assist and protect a constable, who had a civil summons and a civil restraining order to serve on the defendant, and maintenance personnel, who were assigned to shut off the gas to the defendant's stove pursuant to the civil

---

[1]An "infernal machine" for purposes of the statute is a piece of equipment assembled from more than one part. *Commonwealth* v. *Carter*, 442 Mass. 822, 824 (2004). It is a "device for endangering life or doing unusual damage to property, or both, by fire or[] explosion . . . ." G. L. c. 266, § 102A, as amended by St. 1970, c. 422 (prior to its subsequent amendment in 2010, see St. 2010, c. 160, § 6).

[2]The defendant was convicted of improper storage of a "Century Arms rifle" that was leaning against the outside of his bedroom wall, and a "Colt" semiautomatic weapon that was on his bedroom floor. He was acquitted on the two charges related to the "Browning" firearm that was on top of a stack of cases of water, and a "pen gun" that was in his bedroom closet.

restraining order. "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law. We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the evidentiary hearing." *Commonwealth* v. *Delacruz*, 463 Mass. 504, 512 (2012) (citations and quotations omitted).

The motion judge concluded that the defendant's behavior when the police knocked on his door provided them with a reasonable suspicion that he had a gun in his possession and posed a danger to the safety of the police and the civilians who had accompanied the police to the apartment. The motion judge further concluded that the defendant's behavior justified the "initial intrusion of grabbing the defendant's hands" and seizing his person. The motion judge ruled that "[i]t was only after this lawful seizure of the defendant that the police made certain plain view observations of weapons which they reasonably believed to be [improperly stored]" as well as the explosive device.[3]

We affirm the denial of the motion to suppress, but on different grounds. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997) ("An appellate court is free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings"); *Commonwealth* v. *Ocasio*, 71 Mass. App. Ct. 304, 309, cert. denied, 555 U.S. 931 (2008). We conclude that the actions of the police were reasonable under the "pure emergency" or community caretaking doctrine.

To fully understand the circumstances confronting the police on March 17, 2008, it is necessary to consider events leading to their encounter with the defendant.

On Sunday, March 16, 2008, Calvin Gil, a maintenance employee at Avalon Ledges apartments (Avalon Ledges or complex), was called to the defendant's apartment in that complex to determine if it was the source of a gas smell in the building.

---

[3]The motion judge concluded that the Commonwealth could not rely on the civil summons and restraining order as justification for the police entry into and search of the defendant's apartment because they had not informed the defendant of the court order prior to seeking entry. The Commonwealth did not make such an argument, and we do not consider whether this conclusion is correct.

Avalon Ledges consists of 304 apartments in ten buildings. The defendant did not answer Gil's knocks. The gas company, National Grid, was called and Martin Coyne, a technician from the company, responded. He spent two to three hours trying to locate the source of the odor. He focused on the defendant's apartment and knocked on the door. The defendant said he did not feel well and, even when Coyne told him it was an emergency, the defendant refused him entry. Coyne told Gil to call the police because they had to get into the apartment.

At about 11:30 A.M., Officer Dawn Larkin and Sergeants Wayne Barrows and Marie Farrell arrived.[4] Coyne told Officer Larkin that he needed to get inside the apartment to test the level of gas and to make sure that it was safe. He also told her that the gas company had been there on a prior incident. Barrows knocked on the door and, even after spending several minutes explaining the reason for their presence, the defendant refused to open the door. Finally, when the police threatened to break down the door, the defendant opened it two inches. A waft of the odor of gas immediately escaped through the narrow opening. Officer Larkin put her foot in the door and Coyne was able to insert his measuring device into the apartment. The reading displayed "explosive levels" of gas inside the apartment, and Coyne said, "[W]e have to get in there now." Larkin told the defendant they were coming in and she forced entry into the unit. They immediately went to the stove and shut the gas off. Officer Larkin and Sergeant Farrell had to move several things and climb over substantial clutter in order to open the windows.

The defendant was angry and repeatedly told them to get out of his apartment and not to touch anything. After about ten to twenty minutes, Coyne determined that the gas had dissipated and that the air quality was safe. Coyne asked the defendant "what the heck is going on here" and he replied that "he was moving furniture around and . . . must have hit the burner part, and then he went to bed." No one who entered the apartment

---

[4]The transcript initially indicates that Larkin agreed that she was dispatched to the apartment at "1 o'clock in the morning." Because the other evidence uniformly reflects that it was 11:00 A.M., it appears this notation is a transcription error. In addition, the transcript first reflects that Sergeant Barrows responded to the scene with Larkin, but thereafter refers to Sergeant Farrell's additional presence.

reported seeing any firearms inside. Coyne advised the defendant to be more careful, and they left. Coyne testified that to shut off only the gas to the stove, it would have to be shut off from inside the apartment; shutting off the exterior gas line would also shut off the heat.

Once outside the apartment, Officer Larkin and Sergeant Farrell discussed the situation. Larkin told Farrell that she would file a "police report for officer safety" to ensure that other police officers would use caution if they had to return to the unit. Sergeant Farrell indicated that she would ask management to replace the defendant's gas stove with an electric unit.

When Jill Hopkins, the senior community manager at Avalon Ledges, returned to work on Monday, March 17, 2008, the maintenance manager asked her to call Sergeant Farrell about the incident the previous day. Farrell explained what had occurred and told Hopkins that she "need[ed] to do something about this," particularly given that this was not the first incident. Hopkins was also informed by the police that they had had another encounter with the defendant, about a month earlier, during which the police were concerned about his behavior.

Specifically, on February 14, 2008, the defendant had a motor vehicle accident to which the police and emergency medical technicians responded. The defendant struggled with the emergency personnel until they were able to safely remove him from the vehicle. The defendant was carrying a firearm, as well as ammunition. When the police asked him for the weapon while they ascertained what had occurred, the defendant refused and clamped down hard on his right elbow in an effort to block the officers' access to his right front jacket pocket. The police had to tackle him to the ground to wrest it away from him. The responding officer reported that the defendant was "as strong as a bull."[5] The incident did not result in charges against the defendant, but a report was generated and was provided to Hopkins. This incident also alerted the police that the defendant had a license to carry firearms and a Federal license for a machine gun.

After talking with Sergeant Farrell on March 17, Hopkins

---

[5]Hopkins, among others, testified that the defendant had some disability to the extent that he at times used crutches, a wheelchair, and oxygen, and he had a handicap parking placard.

called Avalon Ledges's attorney and asked what could be done. The attorney responded that they needed to "get the gas out of that apartment." The attorney obtained an affidavit from Hopkins and immediately went to court for an order to shut off the gas to the stove. The attorney also advised Hopkins to immediately deliver a notice to the defendant that his apartment would be inspected the following day, March 18, 2008, at 11:00 A.M., and she complied.

Avalon Ledges's attorney filed a complaint in Superior Court and requested emergency relief pending a hearing on its request for a preliminary injunction. A judge issued a temporary restraining order that day, and scheduled a hearing three days later for a preliminary injunction. The restraining order commanded the defendant "to allow management and/or its agents to: enter [his apartment] for the purpose of immediately shutting of[f] the gas to the stove." This order and the "stack" of other court documents that were to be served on the defendant were turned over to Hopkins.

Hopkins called the constable, Gary Dunham, Jr., who arrived at the complex at about 4:30 P.M. to serve the court documents. Dunham's boss had told him that the emergency shut off notice had to be served in hand. Hopkins called the police to protect the constable as well as maintenance personnel who were assigned to shut off the gas to the stove inside the apartment. Sergeant John Burke and at least two other officers arrived at the management office. They discussed what had to be done, the types of weapons the defendant would likely have in the apartment (which, based on a review of the defendant's gun licenses on file in the police department, included a machine gun), and a strategy regarding their approach. The police initially tried subterfuge to get the defendant out of his apartment. They parked an unmarked vehicle in his handicap parking space, hoping that he would come outside to complain as he had done in the past. When this did not work, Sergeant Burke asked Hopkins if this was something that could wait until the defendant left his apartment on his own accord. Hopkins replied that it could not wait because the defendant "ke[pt] filling [his] apartment with gas" and did not go out much.

Sergeant Burke therefore concluded that he had to enter the apartment. He and another officer went to the defendant's door while the constable and the maintenance employee remained behind a short distance for safety. Burke knocked on the door, identifying himself as Weymouth police. Burke detected someone on the other side of the peep hole, but no one answered. He continued to knock and heard the defendant back away from the door and then ask the officer a couple of times to wait. Burke continued to knock and told him, "[W]e want to talk to you about some issues management has." Burke kept knocking and then heard the defendant move toward the door and ask them from behind the closed door what they wanted. Burke urged him to open the door to talk to him "about issues with management," and the defendant finally cracked the door open about two inches.

Sergeant Burke could see only one of the defendant's hands holding the door. Burke asked to see the defendant's other hand and did not believe the defendant's assertion that it was holding the door, because Burke felt the defendant's foot pressing against the door, not his hand. Rather, Burke suspected from the defendant's position that he was holding a gun with the other hand. Sergeant Burke continued to urge the defendant to show him the other hand and the defendant finally complied. At that moment, Burke pressed on the door and grabbed the defendant's left hand while another officer moved in and grabbed his right hand. A third officer grabbed the weapon that the defendant had in a holster on his right side. The gun was loaded and in a position "ready to be fired." Burke tried to handcuff the defendant, but he resisted. Burke "kept telling him it's only for our safety, it's only for our safety, let us handcuff you." The defendant continued to resist. Burke told him they had a court order. Finally, Burke was able to handcuff the defendant and seat him in a nearby wheelchair.[6]

Directly behind the wheelchair were cases of water jugs, and Burke noticed a "loaded, unsecured" firearm on top of those cases. Looking straight back into the apartment, Burke saw

---

[6]In the apartment there were apparently two wheelchairs that the defendant used, although he was also able to walk on his own, at least some if not most of the time.

what looked like an M4 or M16 rifle leaning on the outside wall of what he later determined was the bedroom. One of the officers secured the firearm on top of the cases of water while Burke and another officer approached the weapon leaning against the outside bedroom wall. It, too, was not secured, so an officer secured the weapon.[7] From that location, Burke could see a fourth unsecured weapon on the floor of the bedroom that looked like a machine gun and had a magazine that held over one hundred rounds. From the location of the machine gun, the bedroom closet was visible. The door of the closet was open, revealing more firearms, boxes of ammunition, and an open safe with additional firearms inside.

Once the weapons closest to the defendant were secured, the constable served the defendant, placing the documents on a table next to him and showing him where they were. Calvin Gil entered the apartment, disconnected the gas to the stove, and left. The defendant was arrested for improper storage of firearms and was removed from the apartment.

Sergeant Burke, who by his own account did not know how to make the weapons completely safe, summoned Officer Ficarra, a certified firearms instructor with the Weymouth police department, to do so. While performing this task, Ficarra observed a partially open backpack in the living room and inside he recognized what he believed to be a bomb. The apartment building was evacuated and the State police bomb disposal squad was called.

b. *Discussion.* The defendant argues, largely based on *Commonwealth* v. *Narcisse*, 457 Mass. 1 (2010), and relying on both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, that the police did not have a reasonable suspicion that the defendant had committed, was committing, or was about to commit a crime, and therefore, the seizure of his person (and subsequent warrantless entry into his apartment) were not permitted, regardless of whether the police had a reasonable suspicion that he was armed and dangerous. See *Terry* v. *Ohio*, 392 U.S. 1 (1968)

---

[7] In his testimony, the officer described the process involved in securing the weapons.

(*Terry*).[8] The defendant further argues that, in any event, the police fear that he was armed was not predicated on a threat to the officers' safety, as is required to justify a seizure, but, rather, was based solely on their knowledge that he had perfected his Second Amendment right to bear arms and was a properly licensed gun owner.

The motion judge relied primarily on the second prong of *Terry* (see note 8, *supra*), concluding that the police had a reasonable suspicion in the circumstances presented here that the defendant had a firearm and posed a threat to the police and civilians who were at his door, and that the police did not have a less intrusive means available to ensure their safety and the safety of the civilians with them.[9]

The police encounter with the defendant did not begin with the suspicion of criminal activity but with an emergency court order that had been obtained in a civil action. Of course, the Fourth Amendment and art. 14 are not limited to criminal investigations, but are applicable in all situations involving a governmental intrusion. See *Camara* v. *Municipal Ct.*, 387 U.S. 523, 538-540 (1967); *New Bedford Hous. Authy.* v. *Olan*, 435 Mass. 364, 373 (2001). However, regardless of whether the circumstances at issue are criminal, regulatory, or civil in nature, "the controlling standard [is] reasonableness" for the Fourth Amendment as well as art. 14. *Camara* v. *Municipal Ct.*, *supra* at 539. See *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974); *Commonwealth* v. *Nattoo*, 452 Mass. 826, 832 (2009).

In circumstances of emergency or where the police are exercising their community caretaking functions, however, police may enter premises or make a seizure without a warrant or probable

---

[8]The first prong of *Terry* requires that, in order to justify an investigatory stop, police must have a reasonable suspicion that a person is committing or has committed a criminal offense. The second prong of *Terry* requires that, to proceed from an investigatory stop to a frisk, police must reasonably suspect that the person is armed and dangerous. *Commonwealth* v. *Narcisse*, 457 Mass. at 7. Both prongs must be satisfied before police can escalate an investigatory stop into a protective frisk. *Id.* at 9.

[9]Although we affirm the denial of the motion to suppress on other grounds (see discussion, *infra*), we note that such a conclusion was warranted by the facts and the law. See *Commonwealth* v. *Narcisse*, 457 Mass. at 9 ("a reasonable belief that an individual has a weapon and appears inclined to use it acts to satisfy both prongs of the *Terry* analysis").

cause.[10] See *Commonwealth* v. *Knowles*, 451 Mass. 91, 96 (2008) (emergency is closely related to community caretaking). "In cases of pure emergency, where entry of a dwelling is effected solely to avert a dangerous situation that threatens life or safety, and not for criminal investigatory purposes, probable cause is not needed to enter under either the Fourth Amendment or Article 14." Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 4-2[f][1], at 4-29 (2012-2013 ed.). See *Brigham City* v. *Stuart*, 547 U.S. 398, 403-404 (2006) (circumstances permitting warrantless entry into home); *Commonwealth* v. *Snell*, 428 Mass. 766, 776 n.7, cert. denied, 527 U.S. 1010 (1999). There must be objectively reasonable grounds to believe that an emergency exists, and the conduct of the police must be reasonable under the circumstances. See *Commonwealth* v. *McDermott*, 448 Mass. 750, 766, cert. denied, 552 U.S. 910 (2007); *Commonwealth* v. *Peters*, 453 Mass. 818, 819 (2009). Prompt action, even without a warrant, is permissible in "emergency situations." *Camara* v. *Municipal Ct.*, 387 U.S. at 539. See *Michigan* v. *Tyler*, 436 U.S. 499, 509 (1978) (a burning building "presents an exigency of sufficient proportions" to justify a warrantless entry by fire fighters); *Commonwealth* v. *Jung*, 420 Mass. 675, 681 (1995) (officials do not need a warrant to remain in a building for a reasonable time to investigate the cause of a fire after it has been extinguished); *Commonwealth* v. *Ringgard*, 71 Mass. App. Ct. 197, 199-201 (2008) (police did not need a warrant to enter a burning home, even though the occupant ordered them out of the house).

Here, the police were confronted with an emergency similar to a burning building. The day before their entry, "explosive levels" of gas had filled the defendant's apartment because he had left the stove burner on. Whether the defendant turned the burner on accidentally or purposefully, the risk created by the defendant's proximity to the gas stove was identical. Regardless of whether the defendant bumped one of the knobs, accidentally turning it on, as he claimed, his subsequent inability to recognize

---

[10]The motion judge found that the police were engaged in a community caretaking function, and acknowledged that "on the previous day an emergency may well have existed," but concluded that "on March 17, 2008, no similar emergency was present." On this point, as we shall discuss, we disagree.

the smell of gas, despite complaints from other residents and a two-hour search by the gas technician, who smelled the gas in the building, was as dangerous as his having intentionally filled his apartment with gas. Moreover, the defendant's defiant refusal to permit the gas technician to check the apartment after he explained his concerns cemented serious misgivings about the defendant's judgment. See *id.* at 201 (defendant's unresponsiveness and hostility accentuated the emergency).

When this situation was presented to management, supplemented with additional information that there had been a previous similar incident and that the defendant had recently had a physical altercation with police when they tried to secure his handgun upon responding to his motor vehicle accident, the attorney for Avalon Ledges sought immediate relief from the court to have the gas turned off. The attorney for the complex recognized what the defendant denies on appeal, that as long as the defendant could freely access the gas to the stove in his apartment, the risk of danger was enormous and the defendant's ongoing defiant behavior only heightened that risk.

The attorney for the complex filed a civil complaint and requested a temporary restraining order pursuant to Mass.R.Civ.P. 65(a), 365 Mass. 832 (1974). The rule specifically provides for relief in those instances where it "*clearly* appears from specific facts shown by affidavit or by the verified complaint that *immediate and irreparable* injury, loss, or damage will result" (emphasis added). A Superior Court judge issued an order that afternoon commanding the defendant to allow management to enter his apartment in order to shut off the gas to the stove. The order reflects the judge's implicit finding that the defendant's presence in the apartment with a gas source, an explosive material, presented a clear and immediate danger that would result in immediate or irreparable injury, loss, or damage. Notably, the defendant did not challenge the validity of the court order below, nor does he do so on appeal. Nor was it within the discretion of the police to question or challenge the propriety of the order.

Viewing the court order together with the circumstances underlying the order, an emergency of sufficient proportions was presented to render a warrantless entry reasonable. The emergency exception "applies when the purpose of the police [action] is

. . . because of an emergency, to respond to an immediate need for assistance for the protection of life or property." *Commonwealth* v. *Knowles*, 451 Mass. at 96, quoting from *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219 (1990). With respect to this exception, "the Commonwealth has the burden of showing that authorities had a reasonable ground to believe that an emergency existed and that the actions of the police were reasonable in the circumstances." *Commonwealth* v. *Knowles*, *supra.* Here, the underlying facts, including the court order, served to establish the first prong of this test, much like the smell of smoke alerts a fire fighter that a house may be on fire. See *United States* v. *Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (Fourth Amendment does not require fire fighters to wait until they see actual smoke or flames to enter a building they reasonably believe may be on fire). Moreover, the court order, which prescribed the purpose and extent of the intrusion, fulfilled the purpose of the Fourth Amendment and art. 14 to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.[11]

Once at the door, the evidence that in response to their knocking the police heard the defendant walking from the front to the rear of the apartment and back to the front door, in conjunction with knowledge of a history of defiant behavior and his possession of firearms, created a reasonable suspicion that when the defendant finally cracked open the door two inches, he was armed. In these circumstances, it was reasonable for the police to seize the defendant, secure him with handcuffs, and seat him in the nearby wheelchair until the purpose for their visit could be accomplished. See *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981) ("whether an [emergency] existed, and whether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis"); *Commonwealth* v. *Robbins*, 407 Mass. 147, 152 (1990) (constitutional principles did not require officers "to

---

[11]By acknowledging that the court order added a level of protection from an arbitrary intrusion, we do not suggest that without such an order, the entry would be improper in these circumstances.

gamble with their personal safety"); *Commonwealth* v. *Smigliano*, 427 Mass. 490, 501-502 (1998) (Fried, J., concurring) (appendix collecting cases in which law enforcement officials were permitted to "approach and detain citizens for community caretaking purposes in a variety of circumstances without running afoul of the Fourth Amendment and equivalent State constitutional provisions").

Thus, under the plain view doctrine, the firearms and explosive device were lawfully seized. See *Commonwealth* v. *Santana*, 420 Mass. 205, 211 (1995), quoting from *Minnesota* v. *Dickerson*, 508 U.S. 366, 375 (1993) (when police are "lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant"). Although the defendant properly concedes that the two guns underlying the improper storage convictions (one that was leaning against the outside wall of the bedroom, and the second, on his bedroom floor) were within plain view, he argues that the infernal machine was the product of a search that exceeded the plain view doctrine. We disagree. Officer Ficarra testified that as he was securing the firearms, he saw what immediately appeared to him to be a bomb in a backpack that was partially open. His observations were within the scope of the plain view doctrine. *Commonwealth* v. *Balicki*, 436 Mass. 1, 9-10 (2002) (plain view encompasses items that the police come across inadvertently).

We pause to note that there is no merit to the defendant's contention that his exercise of his Second Amendment right to keep and bear arms was the catalyst for police action in this case or that those rights protected his conduct in this case. The facts establish that the police were acting in circumstances that left them with virtually no discretion but to assist those who were required to enter the apartment. The defendant's response to the police knocking on his door and his behavior upon cracking open the door raised a reasonable suspicion that he had armed himself with a weapon and that he was prepared to use that weapon. See *Commonwealth* v. *Haskell*, 438 Mass. 790, 794 (2003). The officers' fear for their safety was not premised merely on the defendant's having a license to carry a gun,

although that was a component that added legitimacy to their fear that he could be armed. The license to carry a firearm does not include the authority to use that firearm to prevent authorities from responding to an emergency, such as that evinced in this case, namely, this defendant's proximity and access to gas. Nor is there any credible argument that the defendant was acting under the color of self-defense, given the utter lack of evidence, as is required, that he had a "reasonable belief that [he] was about to [be the subject of an assault threatening] great bodily injury or death" by someone unlawfully in the home. G. L. c. 278, § 8A, inserted by St. 1981, c. 696.

2. *Sufficiency of the evidence.* The defendant argues that the evidence was insufficient to show that the explosive device was "primed," meaning capable of detonation, or that he improperly stored the firearms. As the evidence at trial was substantially similar to the facts established at the motion to suppress hearing, we need not repeat those facts here. We supplement that evidence with the following additional facts established at trial, in the light most favorable to the Commonwealth and focusing on evidence relevant to the defendant's specific attack on particular elements of the Commonwealth's case.

a. *The explosive device.* When the defendant was removed from the apartment, Officer Ficarra was called to the scene because of his special expertise with firearms, for the purpose of "mak[ing the firearms] safe." After Ficarra had secured at least seven firearms, he returned to the living room, where he saw five rifle cases on the floor and, after examining them, found some loaded magazines. Near these cases, Ficarra noticed a partially open backpack, in which he saw a gray metal container with a rag and a lengthy coil of hobby fuse on top. Alarmed by the possibility that the object was an explosive device, Ficarra lifted the rag from the top of the can and saw the fuse going inside the can. He immediately reported that he had found a bomb and had everyone, including tenants in other units, evacuate the apartment building. Ficarra held the bag open for a police photographer to take a picture of the device. The police waited outside.

Trooper Scott Fahey, a certified bomb technician with extensive experience in explosive devices, arrived at about 8:00 P.M.

with the bomb squad, entered the apartment, and looked at the device. He testified that he saw about ten feet of hobby fuse coming out of a hole in the top of the lid and coiled next to the canister. Trooper Stephen Sicard entered the apartment and took an X-ray of the device. The X-ray revealed two one-pound cans of what was later determined to be "black powder," a low explosive filler. The X-ray also showed numerous sheet rock screws inside the canister. The hobby fuse was later determined by technicians at the police laboratory to be capable of a quick burn that could transfer flame to the source to be ignited.

Once the explosive device had been removed, Sergeant Burke went into the apartment and picked up the defendant's court documents because he would need them for his report, as well as for the defendant, who Burke anticipated would not likely be returning to the apartment in the immediate future. Burke also noticed something that looked like a manuscript. Part of that manuscript read, "I have explosives, booby traps, fuse igniters, . . . IED explosives. [T]hey have been placed in a 100-mile radius. . . . I am ready to die. . . . If the following people [including, among others, Jill Hopkins] are [not] delivered to me . . . everybody dies."[12]

Meanwhile, the explosive device was transported by the bomb squad in a sand-filled dump truck to an area where it could be safely "disrupted." There, the cap was separated from the canister and Trooper Fahey testified that he looked inside and saw two one-pound cans of "Go-Ex," a type of gunpowder referred to as "black powder," and the hobby fuse going into the interior of each can. Fahey gave an opinion that, based on his training and experience, the device was an improvised explosive device. He explained that the hobby fuse provided the means by which the device could be initiated, causing the explosive black powder to ignite within the two small cans that were contained in the larger canister. By igniting the black powder in a container, a deadly explosion would result and the effects of that explosion would have been significantly exacerbated by the inclusion of shrapnel in the form of the sheet rock screws.

The testimony of both Trooper Fahey and Officer Ficarra

---

[12]The defendant did not challenge the seizure of this document.

established that the hobby fuse was threaded not only through the top of the canister that contained the two cans of black powder, but also into the two cans themselves and therefore, the device was capable of detonation. Thus, the evidence viewed in the light most favorable to the Commonwealth was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the explosive device was capable of detonation. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

b. *Improper storage.* The evidence was sufficient to sustain the charges of improper storage under G. L. c. 140, § 131L(*a*) (statute).[13] The defendant argues that because one weapon was in his living room and the other weapon was in the bedroom, and no one else was in the apartment,[14] the firearms were "thoroughly under his control." Control, however, is not so broadly defined.

"[A] firearm is within the 'control' of its owner . . . only when that person has it sufficiently nearby to prevent *immediately* its unauthorized use" (emphasis supplied). *Commonwealth* v. *Patterson*, 79 Mass. App. Ct. 316, 319 (2011). See *Commonwealth* v. *Runyan*, 456 Mass. 230, 236 (2010) ("gun owner's obligation to secure the firearm in accordance with the statute arises only when the firearm is stored or otherwise outside the owner's *immediate* control" [emphasis supplied]). Thus, "control" for purposes of this statute is distinguishable from the element of possession (and particularly constructive possession)

---

[13]General Laws c. 140, § 131L(*a*), inserted by St. 1998, c. 180, § 47, provides, in pertinent part:

> "It shall be unlawful to store or keep any firearm . . . in any place unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device . . . . For purposes of this section, such weapon shall not be deemed stored or kept if carried by or *under the control of the owner* . . ." (emphasis supplied).

The defendant concedes, at least implicitly, that neither of the two weapons in question were locked or secured, focusing solely on the claim that both weapons were under his control. The defendant also does not argue that the apartment was a "locked container." See generally *Commonwealth* v. *Parzick*, 64 Mass. App. Ct. 846, 848-851 (2005).

[14]The judge instructed the jury that the pertinent time for determining whether the firearms were within the defendant's control was "just before the police entered the apartment."

in other criminal statutes, where the "ability" and "intention" to exercise control over the object is sufficient. See *Commonwealth* v. *Patterson*, *supra* at 319 n.5. Whether a particular gun is under a defendant's control "will depend on the facts and circumstances of any given case." *Id.* at 320. The relevant factors include "the firearm's location, its proximity to its . . . owner, and that person's ability to reach immediately the gun." *Ibid.*

Here, when viewed in the light most favorable to the Commonwealth, a rational trier of fact could conclude beyond a reasonable doubt that neither the gun leaning against the outside bedroom wall, on the opposite side of the living room from the front door, nor the gun on the bedroom floor, yet further away from the front door, was within the immediate reach of the defendant. *Commonwealth* v. *Latimore*, 378 Mass. at 677-678. In addition, the defendant's access to those weapons was made more difficult by the extreme amount of clutter in the apartment, which was clearly depicted in the photographs at trial. In fact, the apartment was so cluttered, Officer Larkin noted that there was barely a path to walk through. She had to climb over substantial clutter to open the windows, and at one point had to climb on top of a table in order to make her way to a window.

3. *Second Amendment.* There is no merit to the defendant's argument that the statute's requirement of "control," as applied in these circumstances, infringed on his constitutionally protected right of self-defense. The defendant was not charged with any offense related to carrying a loaded firearm in a holster on his person when he answered the door, and he was not convicted of any crime related to the second loaded firearm that was immediately behind him. Thus, he was clearly able to protect himself, in stark contrast to the requirement, declared unconstitutional in *District of Columbia* v. *Heller*, 554 U.S. 570, 630 (2008), that all firearms in the home, in the District of Columbia, "be rendered and kept inoperable at all times."

By the time the police arrived on the afternoon of March 17, after the inspection notice had been delivered to the defendant earlier in the day, at least three loaded firearms had been strategically placed in the apartment such that the defendant could retreat from the front door to his bedroom, with enough firepower

along the way to ensure that he could repel any intruders. The scenario was chilling and was further exacerbated by the discovery of the explosive device, designed to maximize firepower and carnage. The statute under which the defendant was convicted reasonably prohibits such conduct.

4. *Jury instruction.* Finally, the defendant argues that the judge should not have instructed the jury that the police had lawfully entered the defendant's apartment because the instruction had the effect of improperly vouching for the credibility of the police.[15] Apart from the fact that the instruction was a question of law for the judge and that it addressed no element of the case, it is clear that the jury were not unduly swayed by it, given their acquittal of the defendant on two of the five charges. There was no error.

*Order denying motion to suppress affirmed.*

*Judgments affirmed.*

---

[15]The defendant did not object to this instruction before the jury retired to deliberate as required by Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979). The defendant only objected when the jury wrote a note asking whether they could consider the lawful entry of the police. The judge answered that the entry was lawful.